STATE OF NEBRASKA, APPELLEE, V.
DOUGLAS A. KINNEY, APPELLANT.
635 N.W.2d 449

Filed November 9, 2001.    No. S-00-750.

Gregory C. Scaglione, of Koley Jessen, P.C., L.L.O., for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

After a jury trial, Douglas A. Kinney was convicted of two counts of theft by unlawful taking, in violation of Neb. Rev. Stat. § 28-511(1) (Reissue 1995). The district court for Douglas County sentenced Kinney to 2 years' probation and ordered restitution and community service. Kinney appeals.

## SCOPE OF REVIEW

When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Sanchez-Lahora*, 261 Neb. 192, 622 N.W.2d 612 (2001).

## FACTS

Wolfe Automotive Group (WAG) manages 15 automobile dealerships in Missouri, Kansas, Illinois, and Nebraska. Its headquarters is in Kansas City, Missouri. Jeffrey Wolfe and his sister Cynthia Tucci each own 45 percent of WAG, and Dave Gatchell, WAG's chief operating officer, owns 10 percent. Wolfe and Tucci are also the majority owners in the 15 dealerships, which are organized as independent entities. At all but four of the dealerships, the general manager owns a minority interest in the dealership and is considered the managing partner.

Kinney was hired by WAG in 1994 as an internal auditor. He had a good working relationship with Wolfe and was rapidly promoted to chief controller and eventually to chief financial officer. During this time, Kinney was instrumental in establishing how the dealerships' accounting information would be interpreted, how this information would be reported on WAG's statements, and the standards to which WAG held its employees. Kinney was also involved in formulating and implementing WAG's policies.

In the spring of 1997, WAG was approached by a broker about the possibility of purchasing H.P. Smith Ford (H.P. Smith), an automobile dealership in Omaha, Nebraska. After several months of negotiations, in which Wolfe, Tucci, Gatchell, and Kinney all participated, an agreement was reached for the purchase of the dealership.

During the negotiations prior to the purchase of H.P. Smith, Kinney asked to be considered for the general manager position. Kinney was given the position based on his knowledge of the business. As general manager, Kinney was permitted to purchase a 10-percent equity interest in the dealership for $10,000, which entitled him to a yearend bonus of 10 percent of the dealership's profits. The annual profit of H.P. Smith was projected to be $2 million. Wolfe and Kinney discussed Kinney's compensation and agreed on a salary of $6,000 per month and a monthly draw of $4,000 as an advance on his yearend bonus, for total compensation of $10,000 per month.

While Kinney was general manager, he had full management authority and was the owner with responsibility for the day-to-day operations of H.P. Smith. Kinney worked with the dealership's

controller to improve its accounting system, including streamlining the accounts payable and payroll departments.

As general manager of H.P. Smith, Kinney had a company credit card in his name. Some of the charges made on the credit card while Kinney was general manager were for personal expenses. In addition, during 1997 and 1998, a number of checks were issued by H.P. Smith to Kinney. Some were expensed to different accounts within H.P. Smith, while others were debited to Kinney's accounts receivable employee account. In August and September 1998, Kinney and his wife ordered furniture from a furniture store to be delivered to their residence. The invoices, which were sent to and paid by H.P. Smith, were debited to Kinney's accounts receivable employee account.

On January 20, 1999, Wolfe and Tucci terminated Kinney for perceived irregularities in the accounting of the sale of H.P. Motor Sports, which had been a drag-racing division of H.P. Smith. WAG subsequently hired a forensic audit team to investigate the financial transactions involving Kinney while he was the general manager of H.P. Smith. After WAG complained of Kinney's conduct to the Omaha Police Department, he was arrested at his residence on April 23.

Kinney was originally charged by information on May 12, 1999, with one count of theft by deception, to which he pled not guilty. The trial court overruled a plea in abatement on August 12. Kinney subsequently filed a motion for a bill of particulars. At a pretrial conference on November 8, the trial court ordered counsel to exchange out-of-state witness lists on or before December 1. Prior to December 10, counsel were ordered to use good faith efforts to reach agreement on exhibits and objections to such exhibits. On December 10, over Kinney's objection, counsel were ordered to confer regarding exhibits.

At a hearing on December 22, 1999, the State requested leave to produce an amended information, copies of which were provided to the trial court and Kinney at that time. The amended information divided the case into four counts of theft by unlawful taking, with specific timeframes listed for each count. The State then read each new count and described the evidence it intended to produce on each count. The trial court granted the State's motion for leave to file the amended information, which

it filed on December 23, and Kinney moved for a bill of particulars as to the amended information. The trial court overruled the motion for a bill of particulars on December 28. On the record, but outside the presence of the trial court, defense counsel again objected to the court's order for compulsory production of trial exhibits.

Trial to a jury occurred on January 4 through 7 and 11, 2000. After the State presented its case, Kinney moved to dismiss all four counts with prejudice, which motion the trial court denied. Kinney then presented his case. Closing arguments were delivered, and the case was submitted to the jury on January 12. On January 14, the jury returned verdicts of not guilty on counts II and III. On count I, the jury found Kinney guilty and determined that the value of the property taken was $6,620. On count IV, the jury found Kinney guilty, and the value of the property taken was determined to be $1,665. On January 24, Kinney moved to set aside the verdict or, in the alternative, for a new trial. Both motions were overruled.

On June 20, 2000, the trial court ordered Kinney to complete 2 years' probation, to pay restitution in the amount of $8,285, and to complete 100 hours of community service. Kinney appealed, and we moved the case to our docket pursuant to our statutory authority to regulate the caseloads of this court and the Nebraska Court of Appeals.

## ASSIGNMENTS OF ERROR

Kinney assigns as error that the trial court erred in (1) ordering him to produce his trial exhibits and to disclose his potential out-of-state witnesses to the State before trial; (2) receiving evidence of uncharged misconduct; (3) overruling the motion for a protective order and motion to quash regarding a subpoena duces tecum issued to Norwest Bank; (4) overruling Kinney's motion for a bill of particulars; (5) finding sufficient evidence to support Kinney's convictions on counts I and IV; (6) admitting evidence over Kinney's objections; (7) excluding evidence Kinney offered; (8) sustaining the State's motion in limine; (9) sustaining an objection to statements made during Kinney's voir dire; (10) failing to adequately instruct the jury regarding criminal intent; and (11) overruling Kinney's motions to dismiss, for

directed verdict, and to set aside the verdict or, alternatively, for a new trial.

## ANALYSIS

Kinney first argues that the trial court erred by ordering him to produce his trial exhibits and to disclose his potential out-of-state witnesses to the State before trial. This same argument was made in support of Kinney's motions to dismiss, his motion for a directed verdict, and his motion to set aside the verdict or, in the alternative, for a new trial, the dispositions of which are the subject of Kinney's 11th assignment of error.

At a pretrial conference on November 8, 1999, the trial court ordered counsel to exchange out-of-state witness lists by December 1 and to use good faith efforts to reach agreement on exhibits and objections on exhibits. At a second pretrial conference on December 10, the trial court again ordered counsel to exchange out-of-state witness lists by the close of business that day and, over the objection of the defense, to confer regarding exhibits on December 17. At a hearing on December 28, the trial court clarified that its order would encompass a document about which testimony would be adduced at trial. The trial court's stated purpose for the order was to ensure that the trial ran smoothly and efficiently. Pursuant to the trial court's orders, Kinney filed a limited witness disclosure on December 2 and original and supplemental out-of-state defense witness disclosures on December 10 and 13, respectively.

In *State v. Woods*, 255 Neb. 755, 764, 587 N.W.2d 122, 128 (1998), we stated:

> The common law recognized no right of discovery in a criminal case by either the prosecution or the defendant. . . . In Nebraska, the prosecution has not been granted a right of discovery except as permitted by the court, with limitations clearly defined by statute. . . . Additionally, in the absence of a statute, Nebraska has not required defendants to plead defenses in advance.

(Citations omitted.)

" '[D]iscovery in a criminal case is generally, and in the absence of a constitutional requirement, controlled by either a statute or court rule.' " *State v. Lotter*, 255 Neb. 456, 490, 586 N.W.2d 591, 618 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673

(1999) (quoting *State v. Tuttle*, 238 Neb. 827, 472 N.W.2d 712 (1991)). This court has not established any court rules that would provide the State with a right of discovery in criminal cases. Neb. Rev. Stat. §§ 29-1912 to 29-1927 (Reissue 1995 & Cum. Supp. 2000) are the statutory provisions governing discovery in criminal cases, and §§ 29-1916 and 29-1917 are the only sections that authorize discovery by the State. Section 29-1917 permits a court to order the taking of depositions of certain witnesses, and therefore, it is inapplicable to Kinney's assignment of error. Section 29-1916(1) provides in part that whenever the court grants a request by the defendant for discovery pursuant to § 29-1912,

> the court may condition its order by requiring the defendant to grant the prosecution like access to comparable items or information included within the defendant's request which:
>
> (a) Are in the possession, custody, or control of the defendant;
>
> (b) The defendant intends to produce at the trial; and
>
> (c) Are material to the preparation of the prosecution's case.

Kinney argues, and we agree, that § 29-1916 did not provide a basis for the trial court to order him to produce his exhibits, since he never requested a discovery order pursuant to § 29-1912. The trial court ordered the production of the exhibits and exchange of witness lists in order to ensure the "smooth running of th[e] trial" and an "efficient presentation of th[e] case." We conclude that the trial court exceeded its authority and erred as a result.

Kinney was required to produce his trial exhibits without restriction and to disclose to the State every document which might have been used for any purpose. In *State v. Woods, supra*, we held that the trial court's order to disclose the identities of potential alibi witnesses was reversible error.

Here, Kinney was required to disclose not only the identities of certain witnesses but the substance of potential rebuttal and impeachment testimony as well. As a result, the State was provided with advance notice of Kinney's potential rebuttal and impeachment evidence. Thus, the witnesses called by the State were apprised of impeachment evidence that would be used in Kinney's defense.

Kinney was required to essentially provide the prosecutor with his entire case, including key impeachment evidence, before the trial began. If a remand were to be allowed, the prosecution would have the advantage of knowing the entire strategy of Kinney's case. The prosecution could then use that knowledge in ways that cannot be cured on remand. For example, the knowledge might allow the prosecutor to (1) craft the opening statement anticipating Kinney's defenses and minimizing his case, including deflating the impeachment evidence; (2) anticipate the cross-examination of the State's witnesses and prepare the witnesses for that cross-examination; (3) orchestrate the order of witnesses; (4) forgo calling certain witnesses because of the knowledge that impeachment evidence exists, perhaps forcing the defense to call those people as witnesses, which would then allow the State to lead these witnesses in questioning; (5) use the knowledge and extra time to obtain new witnesses whose testimony is not as likely to be impeached or to gather evidence to rebut the impeachment evidence; (6) anticipate, formulate, and advance the argument against a motion to dismiss; and (7) prepare the closing arguments well in advance of trial.

Because of the unusual circumstances, no remedy fashioned will return the parties to pretrial status quo. Unlike the situation in *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998), the error committed cannot be cured by remanding for a new trial and ordering discovery restrictions. Therefore, we reverse the judgment of the trial court and remand the cause with directions to dismiss with prejudice.

## CONCLUSION

For the reasons set forth herein, the judgment of the trial court is reversed and the cause is remanded with directions to dismiss the amended information with prejudice.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

HENDRY, C.J., not participating.