IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AVA M. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AVA M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NICHOLAS M., APPELLANT, AND AMANDA S., APPELLEE.

Filed June 11, 2024.    No. A-23-782.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Liam K. Meehan, of Wagner Meehan, L.L.P., for appellant.

Christopher McMahon, Deputy Douglas County Attorney, and Kinzie Randall, Senior Certified Law Student, for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Nicholas M. appeals the adjudication of his children in the separate juvenile court of Douglas County. He challenges the juvenile court granting reciprocal discovery without a hearing, allowing his daughter, Ava M., to testify outside his presence at the adjudication hearing, finding Ava's testimony credible, and the sufficiency of evidence. Based on the reasons that follow, we affirm.

## BACKGROUND

In February 2023, the State filed a petition alleging that Ava, born February 2008, came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that she lacked proper

parental care by reason of the fault or habits of Nicholas. Later the same month, the State filed an amended petition alleging that Ava and her three siblings, Preston M., born February 2015; Scarlett M., born March 2016; and Royal M., born July 2017, came within the meaning of § 43-247(3)(a) in that they lacked proper parental care by reason of the fault or habits of Nicholas. The amended petition further alleged: (A) Nicholas is the legal father of the four children; (B) Nicholas subjected Ava to inappropriate discipline and/or conditions; (C) the other children witnessed inappropriate discipline and/or conditions; (D) at the time of the filing, there was no one who could legally provide for the care, support, and supervision of the children; (E) Nicholas failed to provide the children with safe, stable, and/or appropriate housing; (F) Nicholas failed to provide the children with proper parental care, support, supervision, and/or protection; and (G) due to the allegations, the children were at risk for harm.

In June 2023, the guardian ad litem (GAL) filed a motion to allow the children to testify in chambers and a notice of hearing. Although the motion stated it pertained to all the children, only Ava's testimony was at issue. Following a hearing, the juvenile court found there were legitimate concerns about Ava testifying in the presence of her father and granted the motion.

Also in June 2023, the State filed a motion for reciprocal discovery. Nicholas filed a motion to strike. The juvenile court granted the motion for reciprocal discovery and overruled Nicholas' motion to strike.

Subsequently, an adjudication hearing was held on the State's amended petition to adjudicate Ava, Preston, Scarlett, and Royal. Following the hearing, the juvenile court found the minor children to be within the meaning of § 43-247(3)(a) by a preponderance of the evidence and found all counts in the amended petition to be true.

*In Chambers Hearing.*

At the hearing on the GAL's motion to allow Ava to testify outside the presence of Nicholas, Teunnia Archie, Ava's high school counselor, testified. She had been involved with education for 20 years and had been a school counselor for 14 years. She had a bachelor's degree, a master's degree in school counseling, and a master's degree in administration.

Archie testified that she had known Ava since August 2022 and began having counseling sessions with her after she was removed from Nicholas' home in February 2023. They discussed problems in Ava's life causing her stress and anxiety. Ava told Archie that she was stressed and anxious about the possibility of having to go back home to live with her father. Archie testified Ava was afraid of going home and indicated "she was not liked in the home." Ava also told Archie she was not treated the same as the other children in her home. Ava also said that her anxiety increased when there was an upcoming court date.

Archie testified that there was a time when Ava thought she was going to have to move back to her father's house, and she attempted to harm herself several times and was hospitalized one of those times. When Ava came back to school after the hospitalization, she told Archie that if she had to live with her father, she would harm herself. She also told Archie she would kill herself if she had to go back.

Archie testified Ava was also seeing a therapist and she received weekly or biweekly updates from Ava's therapist on how Ava was doing and if she needed different resources at

school. She explained that Ava received educational accommodations for her anxiety, such as being allowed to step out of class when needed and doing her schoolwork in the counseling office.

Archie testified that the only interaction she had with Nicholas was on January 20, 2023, when Nicholas came to the school to take Ava home because he believed she had been involved in stealing Nicholas' girlfriend's purse. Before Nicholas arrived at the school, Ava was waiting for him in Archie's office. Archie observed that Ava was visibly anxious, was shaking, had reddening of her skin, and her body was tense. In Archie's opinion, Ava was exhibiting fear. When Ava saw her father, Archie observed that Ava was nervous and said she did not want to leave and needed to stay in school.

Archie testified that based on her training, experience, and interactions with Ava, she believed Ava's mental health could be harmed if she had to testify in the presence of her father. She also opined, based on her education, experience, the interactions between Ava and her father, as well as Ava's self-reporting and accommodations, that Ava would be at risk of harm if she had to confront her father in the courtroom. Archie acknowledged that her professional experience does not allow her to diagnose any type of mental disorder, nor does she have a mental health practitioner license.

*Adjudication Hearing.*

At the adjudication hearing, Lois Rasgorshek, the assistant principal at Ava's high school, testified that on January 20, 2023, Nicholas came to the school and stated he was taking Ava out of school for a week because there had been a robbery at their home the night before and he believed Ava was involved. Nicholas told Rasgorshek that Ava was not going to have access to her school iPad during that time she was gone from school. Rasgorshek believed Nicholas was taking Ava out of school as a punishment. She testified it was uncommon for parents to remove a child from school to punish him or her for something that happened at home. She was concerned for Ava's safety because Nicholas was isolating her for a week without access to technology to do her schoolwork. After Ava and Nicholas left the school, Rasgorshek called Child Protective Services.

Ava testified that on January 20, 2023, Nicholas took her out of school because his girlfriend, Gonca C., had accused Ava of stealing her purse. Ava stated that when he picked her up from school, he said he was going to kill her and called her names, such as "fucking bitch." On the way home, they stopped at the post office, and Ava ran into a nearby store because she thought Nicholas was going to hurt her. She asked an employee to call the police, which he did. The police arrived and later took her home. After she was home, Nicholas took her to her bedroom in the basement. Ava testified that Nicholas told her she could not leave and locked her in her room. There was a lock on the outside of her door. She testified that prior to locking her in the bedroom, Nicholas kicked "the sides of [her]" at least five times and pulled her hair, all while calling her a thief and liar. She later testified that the physical contact happened the next day.

Ava testified that she was locked in her room for a total of 8 days. She stated that in the mornings, Nicholas would throw cold water on her to wake her up and give her a Pop-Tart to eat. She testified that she was not allowed to sleep on her bed; she had to sleep on the floor in her bedroom. She was given one or two meals a day. She had to urinate and defecate into a bucket that was in the utility closet in her room. Gonca would allow her to leave the bedroom once or twice a

day to use the bathroom that was next to her bedroom, and she could empty the bucket at that time. Her father never let her out of her room, only Gonca. Occasionally, Gonca would leave Ava's door open, but Ava was not allowed to leave the room without permission. She further testified that her dad told her she was not allowed to leave the basement.

Ava testified that her siblings knew she was locked in her room. On one occasion she heard Nicholas yelling at Preston because he had brought her waffles. Another sibling tried to sneak her pieces of cereal.

On the 8th day of being confined in her bedroom, Ava's mother picked her up from Nicholas' house for her weekend parenting time. Ava told her mom what had happened and said that she was scared to go back to her father's house. She also told her mother if she had to go back to her dad's house and live in her bedroom and not go to school, she would kill herself. Due to concerns for Ava's mental health, her mother checked her into the hospital, where she stayed for more than 5 days for medical treatment. During her stay, she told the nurses what had occurred at her father's house and that she was scared that her father would hurt her if she went back to his home.

Ava testified she was scared to live with her father again and would not feel safe at his house. She was also scared for her siblings because they knew how Nicholas had treated her.

On cross-examination, Nicholas' counsel asked Ava about the amount of food she was given daily, and she clarified that some days she was given only Pop-Tarts, but other days she was given a "normal amount" of food twice a day. She later testified that sometimes she was given food once a day and sometimes she was given food twice a day. She also testified that after a couple days of being isolated in her bedroom she started having thoughts of harming herself.

Ava also testified that during the first day she was confined to her bedroom she had to urinate in a water bottle. She admitted that she had not told police officers about having to urinate in a water bottle, and that it was the same water bottle she was seen drinking out of in a video admitted into evidence.

On redirect, Ava testified that during the 8 days she was allowed to leave her room on occasion, but for the most part she was prohibited from leaving her room. She was not allowed in any other area of the basement and believed if she left her bedroom without permission Nicholas would get mad and hurt her.

Ava admitted that when police officers came to the house on January 24, 2023, to check on her, she lied to them and said she did not fear for her safety. She testified that she lied because she thought Gonca was listening to their conversation. Ava also testified that she did not trust one of the officers because that officer was the same one who took her home on January 21, 2023, after she ran from Nicholas. Ava further testified that she also lied to the officers when she admitted to stealing Gonca's purse. She stated she lied about it because her father was yelling and threatening her, and she was scared.

During Ava's testimony she was shown and asked about pictures and videos taken in the basement of the home by a motion-sensor camera that was directed toward Ava's bedroom door and the bathroom door next to her room. Some of the pictures/videos showed Ava's bedroom door was open. The pictures/videos Ava was in showed her in the doorway of her room, in the doorway of the bathroom, or moving between the two. There were no pictures/videos on January 20, 21, 22,

or 24, 2023, showing Ava leaving her bedroom at all. None of the pictures/videos showed her receiving food.

Omaha Police Officer Jamie Madson testified that she and another officer were dispatched to Nicholas' home on January 24, 2023, to check on Ava's well-being. Gonca let the officers into the home and led them to the basement. Once in the basement, Madson noticed a camera pointed toward Ava's bedroom door. When Madson entered Ava's room, Ava was sitting on the floor behind the door and was wrapped in her bedding. She asked Ava a series of questions about how she was being treated by Nicholas. Madson described Ava as being reserved and scared. Ava indicated she was worried that Gonca was at the door listening to their conversation. Once she was assured that Gonca was not nearby, Ava started crying and was more forthcoming with information.

Madson testified Ava said she was being forced to use an unfinished space in her bedroom as a bathroom. Madson opened a door in Ava's bedroom and observed an unfinished space that contained a bucket, a plastic tray that resembled a bedpan, tampons, and a roll of toilet paper. Madson testified it was possible Ava was using the bucket or the plastic container as a toilet, but it was also possible they could have been there for another purpose. She could not say the same thing for the tampons and toilet paper.

Ava told Madson she was locked in her room continuously, except when she was allowed to use the bathroom to dump out her bucket. Madson did not smell an odor of urine or feces in the room. Ava indicated that she was getting two meals a day and she did not indicate that water was being withheld. Ava also disclosed that Nicholas had physically assaulted her. Madson looked over Ava's body for bruises and did not see any but stated that bruises are not always present when an assault happens.

After speaking with Ava for 5 to 10 minutes, Nicholas arrived home and came into the bedroom. He was angry and explained why Ava was home and not in school. He said she was grounded for the week because he believed she was responsible for stealing Gonca's purse and it was not the first time she had stolen money from the house. He did not let Madson and the other officer talk further with Ava. Madson believed there was a risk of harm to Ava from Nicholas after visiting her that day.

Madson also testified that during her conversation with Ava her story evolved but Madson never had any concerns about her truthfulness. She stated that Ava's body language suggested she had a genuine fear.

Julia G., Ava's best friend, testified that Nicholas called her in late January 2023 asking her what she knew about the theft of Gonca's purse. Nicholas told Julia that Ava was a liar and that he was going to lock her in her room. He also stated that Ava did not need food and he was going to cut her hair. Julia testified that the conversation concerned her, and she was worried that Ava might get hurt or "something bad was going to happen" to Ava, so she told her mom about what Nicholas had said. She also contacted Ava's grandparents about the phone call from Nicholas.

Thomas McCright, Ava's grandfather and Nicholas' father, testified about how Nicholas treated Ava. McCright described Nicholas' interactions with Ava as hostile. He testified about two different occasions where Nicholas spoke to Ava in an inappropriate manner. First, in July 2022, Nicholas told McCright he did not care if the police brought Ava home in a body bag and he called

her "a liar, a thief, a pig, a cunt," and other similar disparaging names. Ava was present when Nicholas said these things. Second, during the winter of 2022, McCright heard Nicholas yell at Ava and call her names such as "fat ass, bitch, liar, [and] troublemaker." McCright testified that in his opinion Nicholas verbally abuses Ava which causes him concern. He further stated he would be concerned for Ava if she had to return to Nicholas' home.

McCright testified at that time he learned Ava was confined to the basement he was only worried about Ava, but based on things he had learned since then he was concerned for all the children living with Nicholas. For instance, Nicholas told McCright he would treat the other children the same as Ava if they stole something. He testified that Nicholas' home was only safe for the children if they did not cross him because his temperament is unpredictable.

After the State rested, Nicholas called Gonca to testify. She testified that she owns a business where she works at home and her work desk is in the basement. She was home with Ava during the week she was out of school.

Gonca testified that Ava was given two meals a day, one in the morning and one in the evening. Gonca stated she would also give Ava something to eat for lunch if she asked. She testified that Ava's schoolwork was emailed to Nicholas, he would forward the emails to Gonca, and she would print the assignments for Ava. Gonca admitted that Ava was not allowed upstairs during that week, but Gonca let her go upstairs a few times to get something.

Gonca testified she never heard Nicholas tell Ava she could not use the bathroom, and during that week she observed Ava come out of her bedroom and use the bathroom in the basement. She never saw Ava carry a bucket or pan to the bathroom. Gonca also testified that during the week, Ava apologized to Gonca for taking her purse and the money inside.

Gonca testified that she had set up the motion-sensor camera in the basement before Ava was grounded. She stated that her purpose in setting it up was to alert her anytime one of the younger children was playing with anything on her work desk or in her closets. She provided Nicholas' counsel with a photo or a video from every time the motion-sensor camera was triggered from January 20 to January 27, 2023. The camera was triggered 31 times during those 8 days.

Nicholas was the last witness to testify. He admitted that he took Ava out of school for 5 days and grounded her as punishment for stealing from Gonca. He testified that Gonca's stolen purse contained $5,000 in cash, credit cards, Gonca's green card, her keys, and a couple loose diamonds. He testified that during the time Ava was grounded, her schoolwork was emailed to him, and she worked on it while she was at home. Nicholas restricted her access to her school iPad because he did not want her to have internet access and/or be able to communicate with people. Nicholas testified that Ava was not confined to her bedroom but was only told she had to stay in the basement.

Nicholas stated that stealing Gonca's purse was not the first time Ava had stolen something. He testified that Ava and her friend had previously stolen over $700 out of his truck in July 2022. Ava first denied any knowledge of what happened to the money, and later admitted to taking $20. Nicholas testified that Ava admitted to him that she stole Gonca's purse.

Nicholas denied assaulting Ava in any way on January 20 or January 21, 2023. He also denied requiring Ava to use a bucket or pan in her closet as a toilet. He explained that the closet in Ava's bedroom is a utility closet that contains the main waterline for the house and has everything for the sprinkler system. The bucket was in the closet because the pipes had leaked on multiple

occasions. He also testified that he never made Ava urinate in a water bottle and her testimony at the hearing was the first time he had heard that claim. He further denied that she was given an inadequate amount of food.

On cross-examination, Nicholas admitted that none of the videos from the motion-sensor camera showed Ava receiving food. He claimed that the camera did not turn on every time there was motion in the basement.

Following the hearing, the juvenile court entered an order finding that the counts in the amended petition were true by a preponderance of the evidence and that Ava, Preston, Scarlett, and Royal were children within the meaning of § 43-247(3)(a) insofar as Nicholas was concerned. The court relied on the disclosures Ava made regarding the conditions of her discipline, which included deprivation of education, isolation, deprivation of food, restricted access to the bathroom, threats of violence, name calling, and physical abuse. The court found the State's witnesses, including Ava, to be credible, probative, and entitled to weight. It also found sufficient evidence that Ava's siblings witnessed, in part, the abuse to Ava and the State proved that absent intervention there was a definite risk of harm to the siblings.

ASSIGNMENTS OF ERROR

Nicholas assigns the juvenile court erred in: (1) allowing Ava to testify outside his presence during the adjudication hearing, (2) granting reciprocal discovery without a hearing which forced impeachment evidence to be disclosed, (3) finding Ava's testimony credible, (4) finding there was sufficient evidence to adjudicate Ava, and (5) finding there was sufficient evidence to adjudicate Ava's siblings.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

*Ava's In Chambers Testimony.*

Nicholas first assigns the juvenile court erred in allowing Ava to testify outside his presence. The Nebraska Supreme Court has held that when the State seeks to have a child testify in chambers at an adjudication or termination hearing, the State must give notice of such request to the parents or their counsel prior to the adjudication or termination hearing. *In re Interest of Danielle D. et al.*, 257 Neb. 198, 595 N.W.2d 544 (1999). Further, a juvenile court must conduct a hearing separate from the adjudication or termination hearing to determine whether reasons exist for excluding the parents from the child's testimony at the adjudication or termination hearing. *Id.* The separate hearing must be held prior to or at the adjudication or termination hearing before the child is allowed to testify. *Id.* At the separate hearing, the State must show that the presence of the parents during the child's testimony would be harmful to the child and, therefore, that the child should be allowed to testify in chambers. *Id.* A child should be allowed to testify in chambers at a

separate hearing when there are legitimate concerns about the child's testifying in the presence of his or her parents. *Id.* It is only logical that the child not be faced with the risk of being harmed when that is what the court is trying to prevent by holding the separate hearing. *Id.* Once the State has made a showing as to why the child should be allowed to testify in chambers, it is then within the juvenile court's discretion to determine whether the child will be allowed to testify in chambers. *Id.*

In this case, there was notice given and a separate hearing was held where Archie testified regarding the risk of harm to Ava if she had to testify in front of her father. Nicholas only argues that the State did not meet its burden to show there were legitimate concerns about Ava testifying in the presence of her father because Archie was not qualified to give an opinion about Ava testifying in his presence. He contends she was not qualified because she did not have "a designation as a mental health practitioner. Nor [did] she have the professional ability to diagnose or assess an anxiety disorder." Brief for appellant at 31. He further points out that the State did not have a therapist or licensed mental health practitioner testify.

The Supreme Court has rejected attempts to expand the State's evidentiary burden beyond the standards set out above in *In re Interest of Danielle D. et al., supra.* See *In re Interest of Brian B. et al.*, 268 Neb. 870, 689 N.W.2d 184 (2004) (State need only show that there are legitimate concerns regarding risk of harm to child if he or she is required to testify in presence of parent). The court has not established a level of education or licensing that a witness must have before he or she can testify about a risk of harm to a child if he or she is required to testify in the presence of a parent or before the juvenile court can find his or her testimony regarding risk of harm credible, reliable, and probative.

Archie gave a history of her counseling experience, as well as her familiarity with Ava. She further testified to Ava's reactions and the visible distress she displayed when her father arrived at school to pick her up. She also testified that Ava was visibly anxious about upcoming court dates. She testified that Ava told her if she had to see her dad or go back to her dad's house, she would harm herself.

Archie testified that based on her training, experience, and interactions with Ava, she believed Ava's mental health could be harmed if she had to testify in the presence of her father. She further gave an opinion, based on her education, experience, the interactions between Ava and her father, as well as Ava's self-reporting and accommodations, that Ava would be at risk of harm if she had to confront her father in the courtroom.

We find that Archie's testimony showed that there were legitimate concerns regarding risk of harm to Ava if she was required to testify in front of Nicholas. In our de novo review, we conclude that this showing was sufficient to permit the juvenile court to exercise its discretionary authority to allow Ava to testify in chambers. Nicholas' first assignment of error fails.

*Reciprocal Discovery.*

Nicholas next assigns that the juvenile court erred in granting the State's motion for reciprocal discovery without a hearing, thereby forcing him to disclose impeachment evidence. He argues the court violated his right to due process by granting the motion without giving him an opportunity to be heard.

The State filed a motion for reciprocal discovery on June 21, 2023, asking the juvenile court to enter an order requiring Nicholas to provide discovery "including but not limited to a witness list and any evidence the defense intends to mark or enter for the Adjudication hearing." The State filed its motion for reciprocal discovery after Nicholas told the State that he had videos he intended to offer into evidence at the adjudication hearing and said he would get them to the State, but later informed the State he would not provide the videos until the day of the adjudication hearing.

The relationship between parent and child is constitutionally protected and cannot be affected without procedural due process. *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020), *supplemented*, 308 Neb. 749, 957 N.W.2d 138 (2021). But due process, "'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Id.* at 841, 951 N.W.2d at 164-65. The concept of due process embodies the notion of fundamental fairness and defies precise definition. *Id.* Due process is flexible and calls for such procedural protections as the particular situation demands. *Id.*

Nicholas relies on *State v. Kinney*, 262 Neb. 812, 635 N.W.2d 449 (2001) in support of his argument that his due process rights were violated by the juvenile court granting the reciprocal discovery motion without a hearing. In *Kinney*, the Supreme Court reversed a conviction finding that the trial court lacked authority to order the defendant to produce his trial exhibits and disclose his out-of-state witnesses to the State before trial. However, *Kinney* is a criminal case, whereas the present case is a civil proceeding. See *In re Interest of Zoie H.*, 304 Neb. 868, 937 N.W.2d 801 (2020). Discovery in criminal cases is controlled by statutes or court rules specific to criminal cases. There are separate court rules for discovery in civil cases. Thus, *Kinney* is not applicable here.

Neb. Ct. R. Disc. § 6-326 (b)(1) provides:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

In addition, the separate juvenile court of Douglas County's Rule 5.1 provides, in relevant part,

[a]ll documents . . . shall be delivered to all counsel . . . at least five (5) judicial days before the hearing in which the documents are to be offered. . . . Absent good cause shown on the record, failure to comply with this rule may result in disallowance of exhibits.

Based on the rules of discovery for civil cases, as well as the Douglas County Juvenile Court's rules, Nicholas already had an obligation to disclose the videos before the adjudication hearing and no hearing was necessary before ruling on the motion. Nicholas' due process rights were not violated by the court granting the State's motion for reciprocal discovery. Nicholas' second assignment of error fails.

*Credibility of Ava's Testimony.*

Nicholas next assigns that the juvenile court erred in finding Ava's testimony credible. He contends that Ava was not a credible witness because she admitted to lying on at least two occasions, admitted her involvement in stealing from Gonca, previously stole from him, and gave inconsistent testimony.

Although appellate courts review juvenile cases de novo on the record, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Nicholas argues that in our de novo review we should not give any deference to the juvenile court's finding that Ava was a credible witness and should conclude that her testimony was not credible. We decline to do so. The juvenile court observed Ava's testimony and made specific findings in its order as to why it found Ava to be credible. Accordingly, we consider and give weight to the juvenile court's finding that Ava's testimony was credible, and after our de novo review of the record, conclude that the court did not err in finding her testimony credible.

*Sufficiency of Evidence to Adjudicate Ava.*

Nicholas contends that the allegations in the petition regarding Ava were not proven by a preponderance of the evidence. We disagree and conclude that there was sufficient evidence to support the juvenile court's adjudication of Ava.

The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Xandria P., supra.* When establishing that a child comes within the meaning of § 43-247(3)(a), it is not necessary for the State to prove that the child has actually suffered physical harm, only that there is a definite risk of future harm. *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012).

In concluding that the discipline imposed by Nicholas was inappropriate, the juvenile court relied on several factors including deprivation of education, isolation, deprivation of food, restricted access to the bathroom, threats of violence, name calling, and physical abuse. As previously discussed, the court found Ava's testimony credible, and it also found the testimony of the other State's witnesses to be credible.

The evidence showed that Nicholas prevented Ava from attending school for 5 consecutive days. Rasgorshek testified that Ava was removed from school by Nicholas on January 20, 2023, a Friday, as punishment for an alleged theft, and stated that he would not allow her to attend school the following week. Ava also did not have access to her school iPad to communicate with teachers and get assignments. She did get some of her assignments through emails sent to Nicholas, but it is unclear how much of her schoolwork she was able to complete. Nicholas does not dispute that he took Ava out of school for 5 days as punishment for the alleged theft. He only argues that doing so did not amount to educational neglect. However, the court did not find that keeping Ava out of school was educational neglect, it only found that it was a factor supporting inappropriate discipline.

Nicholas also argues that Ava's isolation cannot be a factor considered in adjudicating Ava because he was not charged with criminal child abuse when the police officers came to his home on January 24, 2023. There is no requirement that Nicholas be criminally charged with child abuse before certain treatment or discipline of a child can be used to adjudicate a child.

There was evidence to support the juvenile court's finding that Ava was isolated. Ava testified that when Nicholas brought her home from school on January 21, 2023, he took her to her bedroom and told her she was not going to leave and locked the door. She testified that Gonca would allow her to leave her room once or twice a day to use the bathroom, but her father never let her out of her room. She was not allowed to leave the basement and she had to be in her room unless allowed to use the bathroom. Gonca acknowledged that Ava was not allowed to leave the basement, but she let her go upstairs a few times. There was a lock on the outside to Ava's bedroom door. Ava admitted that her door was left open at times, but she was not allowed to leave her room.

As the juvenile court found, the pictures and videos taken by the motion-sensor camera that showed her bedroom door open and her standing in the bathroom doorway only represent a small fraction of the 8 days Ava spent in her bedroom. There were no pictures or videos from the first 3 days Ava was restricted to her bedroom.

Nicholas also argues that the juvenile court improperly found that his restriction of Ava's food supported adjudication. He contends that Ava's testimony on this subject was inconsistent and not credible, and notes that both he and Gonca testified that Ava was adequately fed. He again argues that because he was not charged with child abuse for depriving Ava of necessary food, that cannot be a factor considered in adjudicating Ava.

Ava testified that her food was restricted while she was restricted to her bedroom. She stated that she was given one to two meals a day. She also testified that some days she was given only Pop-Tarts and other days she was given a "normal amount" of food, up to twice a day. As previously discussed, the court found Ava's testimony credible. Ava's best friend Julia also testified that Nicholas told her he was going to lock Ava in her room, and she did not need food. Further, there were no pictures or videos of Ava receiving food.

Regarding Ava's allegation that her bathroom access was limited, Nicholas argues that the juvenile court relied on Ava's uncorroborated testimony. He cites to his and Gonca's testimony that Ava was not instructed to use the bucket in her closet as a toilet. Nicholas also testified that the bucket was in the closet because of leaky pipes. Madson, who observed the items in the closet, testified it was possible Ava was using the bucket or the plastic container as a toilet, but it was also possible the items could have been there for another purpose. She did not know for what other purpose the tampons and toilet paper would be in the closet. However, Madson did not smell an odor of urine or feces in the room.

Ava did not testify that she only used the bucket during her days in isolation. She testified that Gonca let her use the bathroom that was next to her bedroom once or twice a day. The juvenile court found she had restricted bathroom access and did not make a specific finding regarding the use of the bucket. As previously discussed, the court found Ava's testimony credible, and we give weight to its finding.

Nicholas also discounts the court's finding that Ava was not allowed to sleep in her bed during the time she was isolated. He again argues there was no evidence to corroborate Ava's

testimony and contends that because he was not charged with child abuse, there is no evidence to support adjudicating Ava.

Ava testified that she was not allowed to sleep in her bed during the 8 days of isolation. Madson also testified that when she went into Ava's bedroom on January 24, 2023, she was sitting on the floor behind her door wrapped in her bedding. The bed in the room had sheets on it but the rest of the bedding was on the floor where Ava was sitting. There was also a picture entered into evidence, dated January 27, 2023, that showed Ava sitting on the floor of her bedroom holding a cereal bowl and surrounded by her bedding. Again, the court found Ava credible, and we give weight to that finding.

Nicholas next argues that his use of foul language directed at Ava was done in frustration as a parent due to Ava's behavior and should not be used as a factor to adjudicate Ava. Ava testified that when her father picked her up from school on January 21, 2023, he was threatening her and called her a "fucking bitch." Nicholas' father, McCright, testified that he had witnessed Nicholas' open hostility toward Ava. On one occasion Nicholas told McCright he did not care if the police brought Ava home in a body bag. He also testified that he had heard Nicholas call Ava offensive names on two occasions. McCright testified that he believes Nicholas is verbally abusive of Ava.

Based on our de novo review, there was sufficient evidence presented to support the juvenile court's findings regarding its decision to adjudicate Ava. As stated above, we conclude the State proved the allegations of the petition regarding Ava by a preponderance of the evidence.

*Sufficiency of Evidence to Adjudicate Ava's Siblings.*

Finally, Nicholas assigns the juvenile court erred in finding sufficient evidence to adjudicate Preston, Scarlett, and Royal. He argues the State failed to prove an "evidentiary nexus" between the excessive discipline Ava suffered and any definite risk of future harm to Preston, Scarlett, and Royal. See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020).

There was evidence that Ava's siblings were present for and witnessed Nicholas' inappropriate discipline of Ava. They were aware that Ava was confined to her room. Ava testified that Preston brought her waffles on one occasion and got in trouble for it. She also testified that another sibling snuck her pieces of cereal.

McCright testified that when CPS first began their investigation, he was only worried that Ava was at risk of harm, but based on things he had learned since then he was concerned about any of the children living with Nicholas. For instance, Nicholas told McCright he would treat the other children the same as Ava if they acted in the same way as Ava. He also testified that Nicholas' home was only safe for the children if they did not cross him because his temperament is unpredictable.

When establishing that a child comes within the meaning of § 43-247(3)(a), it is not necessary for the State to prove that the child has actually suffered physical harm, only that there is a definite risk of future harm. *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012). The State proved that Ava had suffered inappropriate discipline in Nicholas' care and there was sufficient evidence that the other children were at definite risk for similar discipline and risk of future harm.

We conclude the juvenile court did not err in finding Preston, Scarlett, and Royal were within the meaning of § 43-247(3)(a) by a preponderance of the evidence.

## CONCLUSION

We conclude the juvenile court did not err in adjudicating Ava, Preston, Scarlett, and Royal. The order of the juvenile court is affirmed.

AFFIRMED.